**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE UNITED STATES OF AMERICA

                Plaintiff,

**DOCKET NO.**: 21-CR- 663 (LAK)

      - against -

**Joshua Burrell**,

                Defendant.

---

**DEFENDANT JOSHUA BURRELL'S SENTENCING MEMORANDUM AND**
**MOTION FOR VARIANCE FROM ADVISORY GUIDELINE**

## TABLE OF CONTENTS

Page(s)

Introduction…………………………………………………………………………......5
I.   Personal History of the Defendant….…………………………………………......7
      A.  Mr. Burrell's Background ……………………………………………………8
      B.  Mr. Burrell and Activated Capital……………………………………………15
II.  Sentencing Discussion………………………………………………………………23
      A.  Criminal Conduct………………………………………………………………25
      B.  Justification for a Non-Guideline Sentence…………………………………26
      C.  The Defendant's Remorse…………………………………………....………27
      D.  A Guidelines' Sentence Does Not Meet the § 3553(a) Requirements.….28
            i.      A Guideline Sentence Would Create Unwarranted Sentence
                    Disparities between Mr. Burrell and Defendants with Similar
                    Records who have been Found Guilty of Similar Conduct………..30
            ii.     Guideline Sentence and § 3553(a)..............................................33
                          a)  The Stipulated Loss Amount…………………………………34
            iii.    Demonstrated Community Support for Joshua……………………40
            iv.    Mr. Burrell's Efforts to Make Restitution to his Victims……………53
            v.     The Court Must Consider the Kinds of Sentences Available,
                    Including Non-Incarcerative Alternatives……………………………55
III. Conclusion……………………………………………………………………………..55

## TABLE OF AUTHORITIES

**Cases**                                                          Page(s)

Gall v. United States, 552 U.S. 38 (2007)...............................................7, 23, 26

Nelson v. United States, 555 U.S. 350 (2009).........................................23, 26

Rita v. United States, 551 U.S. 338 (2007)....................................................26

United States v. Abdul Rasheed Yahaya, No. 18-CR-121, 2019 U.S.
       Dist. LEXIS 217668 (E.D.N.Y. Dec. 9, 2019)...................................30, 31

United States v. Algahaim, 842 F.3d 796 (2d Cir. 2016)...............................34

United States v. Booker, 543 U.S. 220 (2005).........................................7, 26

United States v. Binday, 804 F.3d 558 (2d Cir. 2015)...................................36

United States v. Burke, 445 F. App'x 395 (2d Cir. 2011)...............................36

United States v. Callaway, 762 F.3d 754 (8th Cir. 2014)...............................38

United States v. Cavera, 550 F.3d 180 (2d. Cir. 2008)..................................29

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).....................................7

United States v. Diambrosio, No. 04-66, 2008 U.S. Dist. LEXIS 20963,
       (E.D. Pa. Mar. 13, 2008).................................................................31, 55

United States v. Diaz-Argueta, 447 F3d 1167 (9th Cir. 2006)........................24

United States v. Diaz, No. 11-CR-00821-2 (JG), 2013 U.S. Dist. LEXIS
       11386 (E.D.N.Y. Jan. 28, 2013)............................................................55

United States v. Feemster, 483 F.3d 583 (2007)........................................23

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006)..........................27, 30

United States v. Florez, 447 F.3d 145, 157 (2d Cir. 2006)..............................34

United States v. Fumo, 655 F.3d 288 (3d Cir. 2011)................................28, 29

United States v. Gambino-Zavala, 539 F.3d 1221 (10th Cir. 2008)................29

United States v. Gonzales, 163 F. Supp. 3d 1078 (D.N.M. 2016)..............38, 39

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **4** of **57**

United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2012))......................................35

United States v. Harris, 679 F3d 1179 (9th Cir. 2012)..............................................24, 35

United States v. Hartstein, 500 F.3d 790, (8th Cir. 2007)...................................36, 37, 38

United States v. Howe, 543 F.3d 128 (3d Cir. 2008).................................................27

United States v. Hsu, 669 F.3d 112 (2d Cir. 2012)........................................................35

United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 U.S. Dist. LEXIS
      (E.D.N.Y. Apr. 26, 2018).......................................................................35

United States v. Lange, 834 F.3d 58 (2d Cir. 2016).........................................................39

United States v. Lauer, 148 F.3d 766 (7th Cir. 1998).....................................................36

United States v. Lopez, 711 F. App'x 103 (3d Cir. 2017).................................................28

United States v. MacCallum, No. 1:15-CR-00204 EAW, 2018 U.S. Dist. LEXIS
      101047 (W.D.N.Y. June 15, 2018).......................................................36

United States v. Norman, 465 F. App'x 848 (3d Cir. 2012).............................................35

United States v. Reinhart, 442 F.3d 857 (2006)..............................................................23

United States v. Romano, 794 F.3d 317 (2d Cir. 2015)...................................................35

United States v. Smith, 751 F.3d 107 (3d Cir. 2014)......................................................38

United States v. Turk, 626 F.3d 743 (2d Cir. 2010).........................................................38

United States v. Wilken, 498 F.3d 1160(10th Cir. 2007).................................................29

United States v. Zhu, No. 09-00722 (JAP), 2012 U.S. Dist. LEXIS 12952
      (D.N.J. Feb. 2, 2012).......................................................................31, 32

## INTRODUCTION

On <u>April 12, 2022</u>, Mr. Burrell appeared before the Honorable Ona T. Wang and pleaded guilty to one count of a three-count information. He allocuted his guilt as to count 1 of the information, securities fraud in violation of 15 U.S.C. § 78j(b), § 78ff, 17 CFR § 240.10b-5, and 18 U.S.C. § 2. As further detailed below, a sentence within the advisory Guidelines range of 63 to 78 months' imprisonment is greater than necessary under the circumstances, rather a sentence of time served and a three year period of supervised release*,* as permitted by 18 U.S.C. §3561(c)(1), should be imposed as such a sentence would be sufficient, but not greater than necessary, to comply with the sentencing objectives described in 18 U.S.C. §3553.

The Guidelines apply to Count One of Mr. Burrell's case: Securities Fraud (15 U.S.C. § 78j(b), § 78ff, 17 CFR § 240.10b-5, and 18 U.S.C. § 2, a class C felony). The stipulated applicable guideline for a violation of 15 U.S.C. § 78j(b) is USSG §2B1.1, which sets the base offense level at 7, this is raised 18 levels as a result of a calculated loss amount of $6,300,000 under USSG §2B1.1(b)(1)(J), it was further raised by 2 levels under USSG §2B1.1(b)(2)(A), as the offense involved sophisticated means it is raised an additional 2 levels under USSG §2B1.1(b)(10)(C), resulting in an adjusted offense level of 29. <u>See</u> PSR at ¶ ¶ 32-39. This offense level is then reduced by 2 levels as a result of Mr. Burrell's acceptance of responsibility under USSG §3E1.1(a), and as a result of Mr. Burrell's timely plea saving the government the time and expense of preparing for trial it is reduced an additional level under USSG §3E1.1(b). <u>See</u> PSR at ¶ ¶ 40-42. This results in a total offense level of 26. <u>See</u> PSR at ¶ 43.

Mr. Burrell has no criminal history so he is in criminal history category I. <u>See</u> PSR

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **6** of **57**

at ¶ ¶ 7(b), 44-50. Taken together with his total offense level this results in a stipulated guidelines sentence of 63 to 78 months, a stipulated guidelines fine range of $25,000-$5,000,000, Mr. Burrell has stipulated to forfeiture in the amount $107,688, and Mr. Burrell's stipulated restitution amount is $5,763,420. See PSR at ¶ ¶ 7(c), 97, 105, 107, and 109.

.      Under the terms of a plea agreement reached by Mr. Burrell and the Government a sentence of time served and not more than a three year period of supervised release is within the discretion of the judge for sentencing on this conviction. See PSR at ¶ 99. It is respectfully submitted that in Mr. Burrell's particular case, both the sentence duration as advised by the Guidelines and that requested by the Government are "greater than necessary" durations of time to satisfy the factors contemplated by the laws for the imposition of sentence (See 18 U.S.C. § 3553(a)), by reason of the following:

1.    Mr. Burrell has no prior criminal record, and he has led an honorable and lawful life, apart from this arrest;
2.    Mr. Burrell is a devoted son, grandson, brother, and uncle. His close-knit community and sound reentry plan, together with his many personal redeeming qualities, make clear the Mr. Burrell is capable of returning to being a productive and contributing member of society and his community;
3.    This arrest involves a single course of conduct on Mr. Burrell's part that is not representative of how he conducts himself;
4.    The guidelines sentence being primarily driven by the loss amount as calculated by Pre-Trial Services;
5.    The outpouring of support for Mr. Burrell from folks throughout his personal and professional life; and
6.    Mr. Burrell has taken responsibility for his actions by pleading guilty, has expressed very strong remorse, and has committed to forfeiting an amount equal to all proceeds he received as part of his acts and paying full restitution to his victims; Mr. Burrell has already surrendered his ownership share (which was worth more than one million dollars based on the last round of fundraising prior to his departure from his position) in order to try to make his victims whole and he declined to take a salary for his work, even when an industry standard salary was discussed following a

successful fundraising round.

Further, a Guidelines sentence for Mr. Burrell is unnecessary to reflect the seriousness of the offense or to provide just punishment for the offense. Such a long sentence will not provide further deterrence to criminal conduct as compared to a period of time served and a three year period of supervised release. Such a sentence is unneeded to protect the public from further crimes of the defendant. Additionally, Mr. Burrell's Sentence must not be disproportionate to others similarly situated to him.

The balance of the equities in this matter strongly support that the Court grant the application and enter a sentence that varies from the advisory incarceration time under the Guidelines.

By this memorandum and for the reasons more fully set forth below, we request that the Court impose a sentence based upon all the factors set forth in 18 U.S.C. §3553(a); Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 128 S.Ct. 558 (2007); and United States v. Booker, 125 S.Ct. 738 (2005). See also United States v. Crosby, 397 F.3d 103, 108-11 (2d Cir. 2005).

Respectfully, we seek a variance outside the Guideline Provision Range pursuant to 18 U.S.C. § 3553(a) and ask the Court to consider sentencing Mr. Burrell to time served and a three year period of supervised release, as permitted by 18 U.S.C. § 3583(b)(2). Such a sentence would be sufficient, but not greater than necessary, to comply with the sentencing objectives described in 18 U.S.C. § 3553(a).

## I.   PERSONAL HISTORY OF THE DEFENDANT

Every human being is the main character in their story. Given the high volume of cases that come though this courthouse, it is sometimes difficult to distinguish the

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **8** of **57**

person from their case number. Through this memorandum we will demonstrate the factors, including those unique to Mr. Burrell, that should warrant a sentencing variance pursuant to § 3553(a).

### A.      Mr. Burrell's Background

Joshua was born on <u>June 7, 1983</u>, in Saint Louis, MO to Fred Burrell, Jr. and Janet Burrell. However, Joshua, and his sisters Jennifer Scarpelli and Kelly Bagwe, were raised by their maternal grandparents as a result of his parents' divorce early in his life. From the time of his parents divorce Joshua's father, and his father's family, effectively disowned him and his sisters and were not present, nor supportive, in Joshua and his sisters' lives. Joshua's maternal grandparents provided him and his sisters with a stability his parents could not; his mother struggled with alcoholism, cocaine use, and gambling (Joshua would come to understand the extent of her struggles when he realized she was stealing cash and valuables from him as a teenager) and Joshua would see his father a tiny handful of times each year (Joshua estimated that, at best, he might have seen his father two to three times per year as a child).

Joshua's grandparents worked hard to provide for the children, and always made sure there was food on the table, but the family struggled financially. Joshua remembers this time for the car always breaking down and for how rarely the family was able to take a vacation. Mr. Burrell suffered from a developmental disorder as a child and was given daily steroid injections to help with his growth. As he reached his teenage years, assisting his grandmother after she suffered a stroke and his grandfather following his diagnosis with lung cancer.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **9** of **57**

Joshua's Grandfather was a custodian who cleaned office buildings; Joshua would routinely wake up at 4am to help his grandfather before school and was up that early every weekend to help as well. Joshua has never needed another role model for him to know the real meaning of hard work. When his grandfather was routinely sick from lung cancer (he'd been smoking cigarettes since he was around the 11 years old including a pack a day when he served in the Navy). Joshua vividly remembers his grandfather stating he had started smoking too soon but also recalled how, in those years, advertisements said cigarettes were never harmful. Joshua recalls his grandfather saying to him that by the time it was known the harmful effects, that he was already addicted. Joshua watched his grandfather trying to quit but always struggling to stay away from cigarettes for long. Despite taking drugs/alcohol, Joshua would never smoked cigarettes as he did not want to enter the lifelong struggle his grandfather had.

When Joshua's grandfather started to be routinely ill and/or hospitalized, Joshua's grandmother was frightened how the family would pay its bills as the family relied on his income as a janitor and could not afford to lose the office building client. The solution the family arrived at was suggesting the office still be cleaned, but by Joshua rather than his grandfather.

The office agreed to this as long as someone old enough to drive him to the office and enter the alarm code was present, since Mr. Burrell was still a young teen and unable to get a license at the time. Joshua continued doing everything he had seen his grandfather do for all those years anytime his grandfather was unable to work until Joshua had completely taken over the position; Josh wanted to act like an adult and help support the family. Josh watched his grandfather fight but slowly came to realize

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **10** of 57

that he was watching his grandfather die of lung cancer. Joshua was with his grandfather to the very end; holding his grandfather's hand as his grandfather took his last breath.

It was as an early teen, around thirteen ("13") years old, that Joshua first consumed alcohol; he would try marijuana for the first time at fifteen ("15") years old. Both of his grandparents passed away while Joshua was just sixteen ("16") years old.

Following the deaths of his grandparents Joshua had to strike out on his own and find a way to support himself at only sixteen ("16") years old. Josh did not receive any financial support from his grandparents when they passed as the family home they had worked decades to afford had been purchased under a reverse mortgage agreement that left them with nothing to pass on to their family.

Forced to support himself while still a teenager and a student, after working odd jobs after school and on weekends (including mowing grass, shoveling snow, and working as a landscaper), Josh found a job with the Automobile Association of America ("AAA") as an emergency dispatcher. He worked full time, without interrupting his education, and found a place of his own to live. The home Joshua could afford at the time was in what he described as a "bad area" of town, and he had the window of his home shot out while living there. Joshua's landlord at the time simply covered the broken window in cardboard rather than replacing it with a new window. He knew the situation was dangerous for him, and only more so with the unfixed broken window, but at the time there were few alternatives available to him.  Joshua remembers this as a time where all of his motivations were focused on taking care of the bare necessities that ensured his survival. The coping skills he developed throughout this time continue

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **11** of **57**

to serve him and help him to, no matter his personal circumstances, continue working to try to improve the lives of others.

This early experience has remained with Mr. Burrell and is one of the reasons he is driven to try to support housing in distressed communities; he wanted to offer better solutions to those who found themselves in similar circumstances to what he had experienced. Joshua also began trying different drugs around this time, including: cocaine, heroin, and ecstasy.

Joshua is open and willing to discuss his mistakes, but more importantly he wants to learn from them so he can continue working to improve himself. As a younger man, Joshua did not wait to get into trouble with the law before he took it upon himself to make his life better. Joshua stopped taking drugs on his own without professional assistance. Mr. Burrell maintained a relentless disciplined work ethic and pursued an education, which no one in his family had done before, hoping to build a life that would allow him to provide for his family and friends in ways he was not provided for while growing up.

Joshua does not dwell on the mistakes he made as a child; he learned from them and continues to apply those lessons to his life. His childhood struggles taught him how to assess risk better than most of his colleagues (at least in terms of investment risk, Joshua's upbringing has led him to put his personal safety at risk in ways he'd only understand when reflecting back years later. This can be seen at one of his first jobs at Moody's Investor Services. Mr. Burrell received opportunities and promotions early in his career; including opportunities to work abroad in Asia and in Europe. Joshua is aware and acknowledges that luck played an important factor in him

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **12** of **57**

finding these opportunities, but it was his dedication and hard work ethic that led to success in those roles and contributed to job offers he received then and the opportunities available to him now. Joshua had never been overseas before and still has the food menus from his first intercontinental flight which carried him there. Joshua takes nothing for granted and, whatever the outcome of these proceedings, he will continue this as it is the only approach he knows to life.

When reflecting on his early mistakes, Joshua can see how those early experiences shaped his thoughts and actions. He has not consumed any drugs since he was a teenager. Mr. Burrell no longer finds himself tempted by drugs, because admitting his struggle and working with mental health professionals has helped him understand and internalize the mistakes he had made before. Joshua works hard to avoid making the same mistake twice.

Joshua has proven himself to be the type of person that chooses to confront his mistakes and learn from his experience to make him better equipped to avoid other potential mistakes as well.

Joshua graduated from Mehlville Senior High School in Saint Louis, MO, in June 2001. Following his high school graduation Josh continued working and began attending classes at St. Louis Community College Meramec in Saint Louis, MO. Mr. Burrell would attend college there over a period of nearly four and a half ("4.5") years before earning an associate's degree in business. Josh then began attending Saint Louis University in Saint Louis, MO, and graduated in 2008 with a bachelor's degree in Finance and a Minor in Accounting. Josh worked full-time throughout his time in college, did not take any student loans; at times he questions whether what he received

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **13** of **57**

was worth the financial and personal costs at the time, but he knows he would not have built the life he has today without it. Throughout this time Mr. Burrell had continued to work for AAA, moving first into the internal audit department and then into the accounting department.

His first position, working in emergency dispatch allowed him to work night, early morning, and holiday shifts while attending college. Joshua routinely worked holidays because the company paid him 1.5x his normal salary. As an emergency dispatcher, the high stress of the job was ever present; Joshua felt the urgent need to provide any assistance he could with nearly every call that came in. Joshua credits his strong ability to listen and express warm empathy on every single call with his success in the role, and those experiences are one of the reasons Joshua has focused so much of his efforts on trying to help others. During his time at AAA Joshua was the youngest individual working as a dispatcher to earn the 5-diamond customer service award. Shortly after Joshua earned this award, he was able to get several of his friends positions with AAA as he knew they could become successful there as he had.

Mr. Burrell was drinking regularly on weekends from the time he was thirteen ("13") years old. Over time he began to drink during the week as well. In later years Mr. Burrell was able to control his drinking habit, and limit drinking during the week, for most of his twenties ("20s"), but he was still drinking to excess during the weekends. Mr. Burrell stopped drinking entirely in 2020 without any assistance but began consuming alcohol again in 2021. At the time of his arrest Mr. Burrell was not drinking often, but, subsequent to his arrest, he began drinking at least a couple drinks daily during the week and drinking more heavily on weekends. During his Pre-Sentence

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **14** of **57**

Interview Mr. Burrell revealed he discusses his alcohol use with his counselor. See PSR at ¶ 72.

In 2009 Mr. Burrell left his position with AAA and moved to New York City on his own. His first job in the city was working as an analyst for Moody's Corporation. Within a year he was promoted to Senior Analyst; as part of this role he spent two years traveling, including a year in London. Mr. Burrell left Moody's in 2013 to take a position as a Senior Investment Analyst at Colonial Consulting in New York, NY. He would continue in this role for three ("3") years; during the course of 2015 and 2016 Mr. Burrell completed a Certified Financial Analyst program and later earned his Series 7 and Series 63 licenses through FINRA. Joshua worked for Lazard Asset Management in New York, NY, as a vice president from 2016 to 2017.

In 2013 Josh was diagnosed with Attention Deficit Hyperactive Disorder (ADHD) and a generalized anxiety disorder. Eventually he was prescribed adderall and Xanax as part of his treatment. In 2019 Josh stopped taking the Xanax out of a concern he could become addicted to it. Josh's current treatment plan consists of supportive psychotherapy and medication management. Mr. Burrell has worked with a series of therapists and is currently working with Ron Freedman, LCSW.

Mr. Burrell did not like the culture in investment banking and chose to leave New York to pursue other opportunities. Josh worked as the Director of Investments at Midas Capital, based out of Saint Louis, MO, from 2017 to 2019. He was an equity partner in the business and sold his shares back to the company when he left his position. Mr. Burrell would use the proceeds of this sale to personally fund the start-up business expenses for Activated Capital, LLC ("Activated"), his next venture.

### B. Mr. Burrell and Activated Capital

Joshua's vision with Activated was to realize social benefits while also generating returns for his investors; the fund would buy properties in distressed communities, utilizing specific tax benefits available in opportunity zones where the government was seeking to encourage investment and redevelopment. He wanted to build something that he was directly responsible for, and saw an opportunity to direct investments into communities where it was most needed while realizing returns through rental income and appreciating property values for investors. The fund would undertake major renovations, where necessary, with Mr. Burrell personally visiting every site and interacting directly with the project managers and contractors. Activated had a focus on providing jobs to the communities where it was investing, so it would prioritized working with small, local contractors where possible.

Joshua knew what he was walking away from in order to start the fund, he had held equity in his prior company in addition to making a salary of more than $200,000. He had opportunities to continue in private equity roles which would have allowed him to continue to earn such a salary, if not more, or he could have returned to business consulting and received a similar salary. Instead, Mr. Burrell would not take a salary and would not receive any benefits (even health care) during his time with Activated; in fact, Mr. Burrell liquidated his retirement fund and invested the proceeds of selling his equity upon leaving his prior job into the fund. The net result of these moves over the past few years has already left Mr. Burrell at least $500,000 worse off than he would have been if he had pursued a private equity or contracting role, and, as a result of withdrawing funds from his retirement account, will continue to lose out on appreciation

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **16** of **57**

for decades to come raising the cost of his choice even higher. These choices will have direct impacts on Mr. Burrell even into his old age and retirement. All of this comes before taking into account the value of the shares he surrendered to Activated (which was nearly two million dollars at a minimum) as well as before any forfeiture, restitution, and fine. The direct monetary costs to Mr. Burrell total millions and millions of dollars and he will be working to be able to pay restitution and forfeiture for years and years to come.

This was in spite of the fact that after Activated Capital General Partners raised a $500,000 investment from Andrew Willis it was discussed whether Mr. Burrell should draw an industry standard salary. Instead, Josh sought to have the new general partner's investment in projects related to the fund's mission.

Activated would invest in residential and commercial properties, and also sought to develop community social spaces as the communities they served were lacking those sorts of gathering places. Activated would specifically seek out abandoned and distressed properties, so as not to drive current community members from their homes or drive up sale and rental prices to levels unaffordable for the current residents. Such properties would offer better value to investors long term, but often would require significant rehabilitation in order to be restored to a usable condition. Over the course of his time with the fund Mr. Burrell would oversee the acquisition and redevelopment of more than 100 units, including two abandoned churches that are now a performing arts space (that served as a virtual learning center for students in the community during the course of the COVID-19 pandemic) and a community event center (where weddings and birthdays are now regularly held).

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **17** of **57**

Mr. Burrell was inspired to start Activated to try to achieve investment goals while simultaneously investing in local jobs, education, and mental health initiatives, with a focus on distressed communities to create social impact initiatives and realize gains through cash flow and appreciation. Josh sought to eliminate the fees many private equity firms charge for real estate asset management. As the venture continued to grow Mr. Burrell consistently kept total expenses well below the amount that had been budgeted for expenses. The fund still exists and operates within the vision Mr. Burrell set forth, the fund has, and continues to, appreciate in value for its partners while delivering meaningful impacts to the residents and communities where the units are located.

Mr. Burrell and two others jointly co-founded Activated in early 2019. Mr. Burrell was a managing partner for the firm, which specifically invests in real estate properties located in Michigan and Pennsylvania focused on distressed communities. As previously mentioned, Mr. Burrell did not take a salary as part of his role, instead he lived off of his savings, personal retirement accounts, and was reimbursed for expenses he incurred on behalf of Activated. Mr. Burrell left this position in late 2021, after his arrest in the instant case. Activated continues to seek to achieve the goals Mr. Burrell helped set for it. Activated has seen its assets appreciate such that the present value of its assets exceed what it paid for them, as well as exceed the amount of money invested in the venture, in spite of the turbulent economic times during the pandemic. This demonstrates that, at its core, the ideas Joshua initially had for the fund have proven successful. The real estate assets continue to provide cash flow and

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **18** of **57**

appreciate in value. Activated continues to invest in social impact initiatives to improve things in the distressed communities it operates in.

Under Joshua's direction the fund sought out abandoned properties, so that its units would be adding to the available inventory rather than competing with local residents and business owners. This required the fund to make material investments in many properties in order to restore them to a usable condition; Joshua personally dealt with squatters living in some of the units (and directed them to local social support institutions he had established ongoing relationships with). At this time Mr. Burrell was handling a number of functions for the fund, which had a very small team. He even worked directly with some of the applicants to understand credit scores so they would be able to qualify for housing. There were discussions about hiring a chief operating officer to handle the logistics of organizing the project managers and contractors; however, this did not occur and Joshua continued handling these functions. As a result he was usually working seven ("7") day weeks and had to be available at all times to deal with any issue that arose.

Under Mr. Burrell's direction the fund made it a priority to seek out locally owned partners to engage as contractors on its projects. There was a particular focus on hiring women and minority owned businesses. While the end results of this work speaks for itself, both in the jobs created and the inventory of operating units in the fund, this approach also presented unique challenges. Many of the partners Activated worked with were smaller businesses without large capital reserves and proven, long-term track records of success. Joshua would provide all the support he could to Activated's business partners, but there was still the occasional failure to perform on the part of a

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **19** of 57

contractor. When this occurred Mr. Burrell would double down on his efforts, leveraging his community connections to find another contractor, and even occasionally performing work or buying materials directly and completing the construction work personally himself. In spite of the occasional hiccup during this work the projects consistently came in ahead of time and under budget.

Josh had experience in construction work when he was a teenager and jobs were usually willing to hire part time/seasonal workers. Josh did not "upcharge" investors for his time or effort, as would be industry standard practice for a project contractor or general contractor.  Given the scale of some of these contracting projects involved several million dollars, the industry standard 15% fee represents hundreds of thousands of additional income Mr. Burrell forewent in order to prioritize the success of Activated.

Joshua is proud of the spaces Activated and its partners developed and thankful that he was able to bring work into the communities they were serving through the direct impact of the fund as well as the collateral impacts of engaging with business partners throughout the community.

One of Mr. Burrell's tasks was to verify construction issues on the fund's properties. It was during these site visits, which consisted of visiting abandoned, under construction, and rehabilitated properties in the distressed communities they served. These visits could be dangerous and at times Mr. Burrell found squatters living in the fund's properties, which he would try to handle by connecting them with local social service organizations.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **20** of **57**

While Mr. Burrell was at an Activated owned site in Coatesville, Pennsylvania on a Thursday afternoon verifying construction issues on the property he heard gunshots ring out behind the property then saw people running around the house. After initially ducking into cover, Joshua grabbed his phone and recorded a video out his window showing those running. Joshua had established a relationship with the local police as a result of his community efforts and the occasional need to engage with police as part of his work with the funds properties; so when officers arrived Mr. Burrell approached them and shared the video he had taken of the people fleeing and the victim after being shot. Joshua continues to address this incident with his therapist as the experience has had a lasting impact on him. The video helped to confirm the identity of the shooter, who has been apprehended.

Additionally, the Coatesville Police Department approached Mr. Burrell about placing cameras on certain activated properties as part of ongoing investigations on a number of occasions; Joshua always agreed to the requests and provided the assistance he could.

Joshua is most proud of the community spaces Activated was able to develop. In Coatesville, Pennsylvania the Catholic Arch-diocese was selling two ("2") large churches that had been vacant and abandoned for a number of years. Activated bought the sites, each of which consisted of a number of buildings in addition to the large Churches themselves. Coatesville, like many distressed communities, lacked for large-scale community spaces. Under Joshua's direction one church was redesigned into a performing arts space giving artists and young people in the community a safe, affordable space to hold community events and give performances. When such events

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **21** of **57**

were drastically cut back during the COVID-19 pandemic the space was used as a virtual learning center for local children, many of whom lacked access to the necessary technology or internet access to participate in remote learning. There was such demand for the virtual learning space that the performing arts spaces revenue went up during the pandemic and it never took any forgivable loans as part of the government's pandemic response initiatives

The second church was developed into an event and community center. It is available for anyone in the community to rent and, as a result, now there are weddings, birthdays, reunions, and other events held there on a weekly basis. Joshua always found it most rewarding to see the community able to gather in the spaces that had previously been abandoned; the vibrancy and potential of the people was so palpable to him.

As part of the purchase of one of the churches Activated acquired a large number of desks and other school equipment. See Exhibit 1 (Presentation about Activated's Youth Desk Donation Drive in 2020). As this was near the beginning of the COVID-19 pandemic Mr. Burrell knew that many children in the community were lacking a good space to use during virtual learning. Joshua worked with the local school to find students in need of desks and donated the desks directly to families. He coordinated with the school district's bus system in order to arrange deliveries in the most efficient manner, Joshua was so successful at this that the school district asked him to distribute Chromebooks the district had purchased to students along with the desks. In addition, Joshua arranged for the donation of art materials so the students would be able to make the desks their own.Since leaving Activated Mr. Burrell went

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **22** of **57**

door to door asking businesses if they were hiring in order to secure employment. He found a job at a bar, the Corner Bistro, in spite of having no experience in the area prior. In March 2022 Mr. Burrell took a position as a real estate inspector for the Gardner Group and performs 10-15 real estate inspections per week on their behalf. Additionally, he works as a bookkeeper for the medical practice of his sister, Dr. Mahesh Bagwe, and her husband, for about 20 hours per week. He is also working at Epicured, as an analyst earning $60 per hour. Epicured prepares food as medicine to help treat chronic disease. On top of his three paying jobs right now Mr. Burrell is acting as an unpaid consultant for Second Chance Farms of Delaware, a company that operates farms that hire formerly convicted persons, and XMG, a New York company seeking to develop broadband internet access to rural communities.

Further, he has been offered a position with Perfection Steel Erection in St. Louis, Missouri estimating project costs and overseeing projects in a project manager role should he be granted parole in this matter. His plan would be to relocate to St. Louis for the position and to be closer to family, while continuing to be engaged in his other projects. Should Joshua be able to pursue this position, his hope is that one day he would be able to purchase the business for himself through a combination of hard work and sweat equity. If this ever were to happen Mr. Burrell hopes to be able to provide second chances for people like him who have been previously convicted and are seeking to build a new life for themselves and their loved ones.

It is clear that Mr. Burrell has proven his willingness to work and his ability to coordinate multiple jobs, and unpaid consulting work, for extended periods of time. These positions will not only allow Mr. Burrell to follow through on his commitments to

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **23** of **57**

paying the forfeiture and restitution he owes, but offer Joshua multiple career paths and even the possibility of leveraging his strong work ethic into business ownership one day through sweat equity.

Following his arrest he split his time living with first his sister in Missouri and his sister in New York, while subletting the apartment he held a lease on to reduce his cost of living. He has since moved back into the apartment he holds the lease on. He has been seeking out work opportunities, and continuing his drive to support organizations that are making a meaningful impact in traditionally underserved communities. Mr. Burrell contracted the Covid-19 virus in January 2021; when he was still experiencing symptoms, including loss of smell and shortness of breath, months later he joined a "Long Covid" study being conducted by the Icahn School of Medicine at Mount Sinai in New York, NY. Mr. Burrell is hopeful that his participation in the study will help to find treatments for, or ways to prevent, others suffering the drawn out and extended symptoms of Covid-19 as Josh has.

## II. <u>SENTENCING DISCUSSION</u>

The process of sentencing begins with the applicable sentencing Guideline range. <u>United States v. Feemster</u>, 483 F.3d 583, 588 (2007). While "the Guidelines should be the starting point and initial benchmark" of the sentencing process and must be considered as a factor in sentencing, they "are not the only consideration." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007). The Guidelines do not have "quasi-mandatory status." <u>United States v. Reinhart</u>, 442 F.3d 857, 864 (2006). The Supreme Court has emphasized the Guidelines "are not mandatory on sentencing courts; they are also not to be presumed reasonable." <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009).

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **24** of **57**

"[S]entencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." United States v. Harris, 679 F3d 1179, 1183 (9th Cir. 2012). Sentencing is a "difficult art [and it] is easy to make it mechanical...It is... an act of reason as the judge looking at this particular person and the circumstances of the crimes that this particular person has committed makes a judgment following the prescriptions of the statute." United States v. Diaz-Argueta, 447 F3d 1167 (9th Cir. 2006).

Sentencing a criminal defendant requires a court to consider with great care and sensitivity, large complex facts, and factors. The sentence imposed on the defendant should be driven by the "overarching" command of 18 U.S.C. § 3553(a), which instructs district courts to impose sentences that are "sufficient, but not greater than necessary …." to accomplish the Guidelines articulated purposes. 18 U.S.C. § 3553(a)(2). In fashioning an appropriate sentence, the court may consider unlimited information regarding the defendant's background, character or conduct. 18 U.S.C. § 3661.

In determining a minimally sufficient sentence, 18 U.S.C. § 3553(a) further directs the sentencing courts to consider the following factors seven factors to be considered at sentencing: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment

in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.  Criminal Conduct

The United States Department of Probation calculated Josh's total Offense Level as 16 See PSR, ¶ 43, 97. He has a criminal history score of 0 and a criminal history category of I. See PSR, ¶ 47, 97. Mr. Burrell has pledged through his plea bargain agreement to pay all his victims total restitution. He is not trying to find excuses for his conduct; Josh is trying to take responsibility, and make complete amends as soon as possible.

Mr. Burrell is, and will continue to be, a productive and positive member of society. He has no prior criminal history, no other arrests, and no pending charges. Mr. Burrell has a supportive family, who have stepped up and even allowed Josh to live with them during this, and has a strong work history. The Presentence Report has concluded a stipulated Guidelines range is 63 to 78 months' imprisonment was applicable under the conditions present in the case, primarily on the basis of the loss amount. See PSR ¶ 97.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **26** of **57**

## B.  Justification for a Non-Guideline Sentence

In the wake of United States v. Booker, 125 S.Ct. 738 (2005), the Supreme Court has confirmed that under the advisory Guidelines regime, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Nelson v. United States, 129 S. Ct. 890 (2009).

In Rita v. United States, 551 U.S. 338 (2007), the Supreme Court states the Guidelines "insofar as practicable, reflect a rough approximation of sentences that might achieve §3553(a)'s objectives." Rita v. United States, 551 U.S. at 350. In Nelson v. United States, 555U.S. 350; 129 S.Ct. 890, 891-92 (2010) (*per curiam*), the Supreme Court observed "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . The Guidelines are not only not mandatory on sentencing courts, they are also not to be presumed reasonable."

As previously mentioned, the sentencing courts have discretion to impose a reasonable sentence irrespective of the Sentencing Guidelines. A "reasonable sentence" is defined by 18 U.S.C. §3553(a)(2) as "sufficient, but not greater than necessary," to fulfill the sentencing objectives of Congress. Those objectives include, among other things, respect for the law, just punishment of the offender, affording adequate deterrence to criminal conduct, and the protection of the pubic from future crimes by the defendant. See 18 U.S.C. §3553(a).

Moreover, 18 U.S.C. §3553(a)(1) requires that the sentencing Court consider "the nature and circumstances of the offense and the history and characteristics of the defendant." It is our sincere hope that upon close examination of Joshua's

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **27** of **57**

background, experiences and character, as demonstrated by the information contained within this memorandum and the PSR, this Court will impose a "reasonable sentence" of time served and a three year period of supervised release.

### C. The Defendant's Remorse

Mr. Burrell has taken full responsibility for his crime. District courts have held that remorse is an indicative of reduced recidivism and should be considered during sentencing: "The values served by remorse and apology should be more integral parts of the process of prosecution and punishment. For the criminal law to regulate society effectively, and morally educate, it must serve the values of remorse and apology in addition to deterring crimes, inflicting retribution, and protecting the defendant's rights." Bibas & Bierschbach, Integrating Remorse and Apology Into Criminal Procedure, 114 Yale L.J. 85, 125 (2004). At the time of sentencing, Mr. Burrell will address the Court and will express his regret and remorse.

Joshua accepted responsibility for his offense; he is deeply remorseful and ashamed by his conduct. See United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006) (stating that § 3553(a)'s "history and characteristics" "sweeping provision presumably includes . . . remorse"). Mr. Burrell has been compliant with the terms of his supervised release.

In United States v. Howe, the appellate court wrote explicitly "Indeed, a defendant's degree of remorse at sentencing may be considered as a basis for downward variance under § 3553(a) regardless of whether the defendant previously accepted responsibility." United States v. Howe, 543 F.3d 128, 138 (3d Cir. 2008) (Citing United States v. Todd, 515 F.3d 1128, 1134 n.3 (10th Cir. 2008)). Mr. Burrell's remorse is

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **28** of **57**

clear given his pleading guilty, his actions since his arrest (including working multiple jobs and performing unpaid work on projects to increase broadband access in rural areas and providing opportunities for formerly convicted persons, and his commitment to make full restitution to all the victims of his actions.

Mr. Burrell profoundly regrets the actions he took with respect to Activated; however, Mr. Burrell is proud that the fund he built has continued since his departure, that it has realized its goal of owning and developing properties in distressed areas, and that the fund has realized gains with its present value exceeding the

### D. A Guidelines' Sentence Does Not Meet the § 3553(a) Requirements

This Court has discretion in applying the U.S. Sentencing Guidelines in each and every case. One of the important roles of a sentencing judge is to not only decide the appropriate sentence, but to also determine if a Guideline sentence is even required. Due to Mr. Burrell's Guideline sentence being longer than necessary for the purposes of § 3553(a) we respectfully request that the Court grant a variance from the applicable Guideline sentence.

In determining an appropriate sentence within the discretion afforded the district court the court must have "(1) correctly calculated the defendant's advisory Guidelines range; (2) appropriately considered any motions for a departure under the Guidelines; and (3) gave meaningful consideration to the sentencing factors set forth in 18 U.S.C. § 3553(a)." United States v. Lopez, 711 F. App'x 103, 106 (3d Cir. 2017) (Quoting United States v. Freeman, 763 F.3d 322, 335, 61 V.I. 679 (3d Cir. 2014)).

In United States v. Fumo, 655 F.3d 288 (3d Cir. 2011) the appellate court wrote on the separate ways district courts may exercise discretion during sentencing:

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **29** of **57**

> In sentencing a defendant, district courts follow a three-step process: At step one, the court calculates the applicable Guidelines range, which includes the application of any sentencing enhancements. At step two, the court considers any motions for departure and, if granted, states how the departure affects the Guidelines calculation. At step three, the court considers the recommended Guidelines range together with the statutory factors listed in 18 U.S.C. § 3553(a) and determines the appropriate sentence, which may vary upward or downward from the range suggested by the Guidelines.

United States v. Fumo, 655 F.3d 288, 308 (3d Cir. 2011) (Citing United States v. Wright, 642 F.3d 148, 152 (3d Cir. 2011)) (Cleaned Up). We seek a variance in step three of this process given the statutory factors listed in 18 U.S.C. § 3553(a).

Appellate courts have made clear that district courts may impose a sentence granting a variance from the Guideline sentence pursuant to section 3553 when the variance granted is based on "objectively demonstrated, material differences" and falls within the "reasoned exercise of discretion". United States. v. Cavera, 550 F.3d 180, 193 (2d Cir. 2008).

"The government has the burden of proving by a preponderance of the evidence any findings necessary to support a sentence enhancement." United States v. Gambino-Zavala, 539 F.3d 1221, 1228 (10th Cir. 2008). "At sentencing, the district court may rely on facts stated in the presentence report unless the defendant objected to them. When a defendant objects to a fact in a presentence report, the government must prove that fact at a sentencing hearing by a preponderance of the evidence." United States v. Wilken, 498 F.3d 1160, 1169 (10th Cir. 2007) (Quoting United States v. Keifer, 198 F.3d 798, 800 (10th Cir.1999); and United States v. Hooks, 551 F.3d 1205, 1217 (10th Cir. 2009)) (Cleaned Up).

---

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **30** of **57**

> ### i. A Guideline Sentence is Unnecessary and Would Create Unwarranted Sentence Disparities between Mr. Burrell and Defendants with Similar Records who have been Found Guilty of Similar Conduct

U.S.S.G. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".

In <u>United States v. Fernandez</u> the Second Circuit emphasized that, while not applying to disparities warranted by different records or different conduct, courts must consider even a sentence below the Guideline range if a Guideline sentence would give rise to unwarranted sentence disparities. <u>United States v. Fernandez</u>, 443 F.3d 19, 32 (2d Cir. 2006).

An examination of other cases involving aspects of similar conduct and/or similar records demonstrates that a Guideline Sentence would give rise to unwarranted sentence disparities between Mr. Burrell and others with similar records who engaged in similar conduct.

In <u>United States v. Abdul Rasheed Yahaya</u>, the defendant had a total offense level of 22 based on a loss amount of $1.5 million, a criminal history category of I, yielding a guidelines sentence of 51 to 63 months' imprisonment; he was sentenced to time served (3 days). <u>United States v. Abdul Rasheed Yahaya</u>, No. 18-CR-121, 2019 U.S. Dist. LEXIS 217668, at *10 (E.D.N.Y. <u>Dec. 9, 2019</u>). The court cited the limited monetary benefit the defendant received compared to the loss amount attributable to the bank fraud undertaken using his account and physical injuries he had received earlier in life as reasons justifying such a sentence.

As in <u>United States v. Abdul Rasheed Yahaya</u>, the monetary benefit received by

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **31** of **57**

Mr. Burrell, reimbursement for expenses incurred on behalf of Activated, is an extremely limited sum, $107,688, when compared to the stipulated loss amount, $5,763,420. Further, as it was reimbursement for expenses actually incurred while acting on behalf of Activated Joshua, and he was not drawing a salary for his role as is industry standard, the personal benefit to Mr. Burrell of even these funds was extremely limited.

In United States v. Diambrosio the defendant was convicted at trial on ten counts of wire fraud; the district court sentenced the defendant to five years probation, one year of home confinement, $2.1 million in restitution, and a $1,000 special assessment; the government appealed, and the appellate circuit vacated the sentence and remanded the case to the district court while instructing the district court to resentence after applying a two level enhancement for obstruction of justice (bringing the applicable offense level to 23, slightly lower than Mr. Burrell's total offense level of 26). United States v. Diambrosio, No. 04-66, 2008 U.S. Dist. LEXIS 20963, at *1 (E.D. Pa. Mar. 13, 2008).

Upon remand the district court recalculated the applicable Sentencing Guidelines range, fully considered the sentencing factors set forth in 18 U.S.C. § 3553(a), and specifically stated the reasons that support the sentencing determination. Id. The district court reimposed the original sentence of probation, home confinement, restitution, and a special assessment stating that such a punishment would "...provide just punishment sufficient, but not greater than necessary, to reflect the seriousness of the offenses and to afford adequate deterrence, protection of the public and respect for the law" under the circumstances of the case. Id., at *19-20.

In United States v. Zhu, No. 09-00722 (JAP), 2012 U.S. Dist. LEXIS 12952 (D.N.J. Feb. 2, 2012), in deciding to vary downwards from the Sentencing Guidelines

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **32** of **57**

due to:

> …the Defendant's characteristics and conduct indicate that he is a productive and valued member of society in little danger of repeating his mistakes. He has no prior criminal history. It has been amply demonstrated to the Court that Zhu has earned the trust and support of many family and friends, most notably an employer. Not only was he able to procure new employment after leaving enfoTech, but his employer has come to this Court in a show of support, and has continued to trust him with confidential business information. Zhu has also demonstrated that he was raised in a supportive environment and continues to enjoy stable social and familial relationships, including an engagement to be married.

United States v. Zhu, No. 09-00722 (JAP), 2012 U.S. Dist. LEXIS 12952, at *22-23 (D.N.J. Feb. 2, 2012). The court sentenced the defendant to three years probation, without any period of house arrest or fine.

The defendant in that case vigorously defended his innocence throughout the trial, but, in spite of this, was credited by the court with demonstrated remorse and acceptance of responsibility. Id., at 23-24. The court wrote that the defendant was "...not in need of additional deterrence, nor is there any need to send him to jail in order to protect the public from future criminal activity." Id., at 25. The court declined to apply a 14 level enhancement based on loss amount sought by the prosecution as the court credited payments made against claimed losses and the fact that the evidence did not support the claim that the victim had experienced any actual financial loss as a result of the fraud. Id., at 15-16. Had this enhancement been applied Mr. Zhu's total sentencing level would have been 23, just below Mr. Burrell's.

The factors that led the court in Zhu are nearly all present in Mr. Burrell's case. Given Joshua's characteristics and conduct there is little to no danger that he will repeat his past mistakes. There is simply no need for additional deterrence, nor any need for jail time to protect the public from any future criminal activity.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **33** of **57**

As in <u>Zhu</u>, Mr. Burrell has no prior criminal history, has earned the trust of family, and has secured and maintained employment for a substantial period of time; Mr. Burrell has lived with members of his family and continues working for his sister's business.. His sisters, and other family members, provide a strong base of support for Mr. Burrell. Josh is presently working two paying jobs and acting as an unpaid consultant for projects assisting felons reintegrate into society and to improve broadband access in rural areas. Any period of incarceration will set back Mr. Burrell's efforts to make total restitution to his victims.

### ii.    Guideline Sentence and § 3553(a)

Mr. Burrell stipulated that he agrees with the People that the total Guidelines offense level applicable to him is 26. This arises from a stipulated base offense level of seven. USSG § 2B1.1(a)(1). Modified by a two level increase from the stipulated ten or more victims involved USSG § 2B1.1(b)(2)(A)(i), an 18 level increase from the stipulated loss amount pursuant to USSG § 2B1.1(b)(1)(J), and a 2 level increase for utilizing sophisticated means pursuant to USSG § 2B1.1(b)(10)(C). giving an offense level of 29. This level is then adjusted downwards by two levels for Mr. Burrell's demonstrated acceptance of responsibility pursuant to USSG §3E1.1(a) and a one level reduction for timely notifying authorities of his intention to plead guilty pursuant to USSG §3E1.1(b), to give the total Guidelines offense level of 16. <u>See</u> PSR §§ 65-75.

The total Guidelines offense level, however, is only one of the factors a court must consider when determining if a sentence is appropriate under § 3553(a). The Court must weigh these against: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence; and the kinds of

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **34** of **57**

sentences available, among other factors. <u>See</u> § 3553(a).

When specific sentencing factors enhance the Sentencing level, the Court should examine them individually while weighing the § 3553(a) factors in order to determine the appropriate sentence. Mr. Burrell's conduct, especially his continuous efforts to help provide opportunities for felons to reintegrate into society and increase broadband access to rural communities, should be weighed by this Court in determining if § 3553(a) requires a variance from the Guidelines sentence given Mr. Burrell's particular circumstances.

### a) The Stipulated Loss Amount

Mr. Burrell agreed to a stipulation that his Sentencing Level be increased 18 levels due to the stipulated loss suffered by the victims under U.S.S.G. § 2B1.1(b)(1).

Just as with the number of victims, § 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentencing disparities between those who have been found guilty of similar conduct nationwide. Mr. Burrell's sentence should reflect those of similarly situated defendants nationwide.

The Second Circuit has confirmed that, after properly calculating the applicable offense level, a district court may decide to issue a variance when the loss amount Sentencing Level enhancement is the primary driver of a lengthy Guideline sentence. <u>See</u> <u>United States v. Algahaim</u>, 842 F.3d 796, 800 (2d Cir. 2016).

As there is a limited body of law on this issue in the Second Circuit, it is routine for courts in this circuit to rely on persuasive authority from other circuits when there is no binding precedent in this circuit. <u>See e.g.</u>, <u>United States v. Florez</u>, 447 F.3d 145, 157 (2d Cir. 2006) (<u>citing</u> <u>United States v. Joyner</u>, 924 F.2d 454, 460 (2d Cir. 1991)); <u>United</u>

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **35** of **57**

States v. Harris, 167 F. App'x 856, 861 (2d Cir. 2006); See also, United States v. Norman, 465 F. App'x 848  (3d Cir. 2012) (citing United States v. Conner, 537 F.3d 480, 489 (5th Cir. 2008); United States v. Icaza, 492 F.3d 967, 969-70 (8th Cir. 2007); United States v. Yagar, 404 F.3d 967, 971-72 (6th Cir. 2005)). Where, after careful consideration of decisions in this circuit, we could not find applicable controlling precedent, we also turn to the caselaw of other circuits for persuasive precedent on the issue. This is especially apt regarding § 3553(a)(6) as it requires the court to consider sentencing disparities nationwide.

Other district courts have even gone so far as to say that the sentence level enhancements for loss amounts "...do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 U.S. Dist. LEXIS 71257, at *11-12 (E.D.N.Y. Apr. 26, 2018). In that case the court agreed with others in the circuit that these amount of loss enhancements are "fundamentally flawed", and that the court would "refuse to mechanistically impose such an illogical sentence" as the loss amount sentence level enhancement would provide for. Id. (Citing  United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013);  United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012)).

"Loss" is defined as "'...the greater of actual loss or intended loss,' the latter including 'the pecuniary harm that was intended to result from the offense' …'" United States v. Hsu, 669 F.3d 112, 120 (2d Cir. 2012) (Citing U.S.S.G. § 2B1.1, Application Note 3(A)(ii)).

This distinction is well elucidated in United States v. Romano, 794 F.3d 317 (2d

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **36** of **57**

Cir. 2015):

> For fraud offenses, the Guidelines provide that the defendant's offense level is to be calculated based in part on the amount of loss the offense of conviction either caused or was intended to cause, see Guidelines § 2B1.1, whichever is greater, see Id. Application Note 3(A). After providing a base offense level in subsection (a), § 2B1.1 sets out in subsection (b)(1) a loss table that prescribes offense-level increases pegged to the amount of loss. Application Note 3 to § 2B1.1, which begins by stating that it "applies to the determination of loss under subsection (b)(1)," provides that "[t]he court need only make a reasonable estimate of the loss . . . . based on available information," Id. Application Note 3(C), and that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," Id. Application Note 3(B) (emphasis added). When the court has so used gain, the defendant's offense level is increased for the calculated amount in accordance with the loss table.

Id. at 338. This is particularly true for circumstances involving accusations of a ponzi-like scheme; for such schemes the "loss amount" is typically calculated as the amount "actual losses" each individual sustained. United States v. MacCallum, No. 1:15-CR-00204 EAW, 2018 U.S. Dist. LEXIS 101047, at *24 (W.D.N.Y. June 15, 2018). See also, United States v. Hartstein, 500 F.3d 790 (8th Cir. 2007).

The sentencing court must make its own calculations of the amount of the loss based on a preponderance of the evidence. United States v. Burke, 445 F. App'x 395, 398 (2d Cir. 2011) (Citing United States v. Ruggiero, 100 F.3d 284, 290 (2d Cir. 1996)).

The Second Circuit has defined "Intended Loss" as "...the pecuniary harm that was intended to result from the offense…". United States v. Binday, 804 F.3d 558, 595 (2d Cir. 2015) (Citing U.S.S.G. § 2B1.1 cmt. 3(A)(ii)).

The Seventh Circuit has written that "…the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property." United States v. Lauer, 148 F.3d 766, 768

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **37** of **57**

(7th Cir. 1998), That Court used this metric because that amount "...measures the gravity of his crime…". Id.

This approach is justified as "…focusing on the amount of money that the defendant has put at risk helps us to locate the present case in relation to cases involving the fraudulent procurement of loans and contracts." Id. It is clear that the "intended loss" in such cases "...is the part of the loan that the defendant does not intend to repay, or the value of the part of the contractual performance that he intends to omit, rather than the entire loan or entire contract price." Id.

When accusations of a ponzi-like scheme arise, the Eighth Circuit Court of Appeals found "...it is more appropriate to apply a nuanced approach that takes into consideration the facts of the fraud at issue. Such an approach should focus on a defendant's intent rather than make sentencing variations turn on the application of a label as vague as 'Ponzi scheme.'" United States v. Hartstein, 500 F.3d 790, 797 (8th Cir. 2007).

When a case involves allegations of a ponzi-like scheme, "...the particulars of the fraud will inform the sentencing court as to the defendant's intent." Hartstein, 500 F.3d at 799-800 (8th Cir. 2007).

"Actual loss," in turn, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i).

The "actual loss" for which a defendant is liable is "'the reasonably foreseeable pecuniary harm that resulted from the offense.'" and a defendant may receive a credit against the loss "…for which she is responsible in 'the amount the victim has recovered at the time of sentencing from disposition of the collateral, or[,] if the collateral has not

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **38** of **57**

been disposed of by that time, the fair market value of the collateral at the time of sentencing.'" United States v. Turk, 626 F.3d 743, 748 (2d Cir. 2010) (Citing 2B1.1(b)(1)(L) cmt. n.3(A)(i) and cmt. n.3(E)(ii)).

The term "pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money," and, therefore, does not include non-economic harm. Id. cmt. n.3(A)(iii). Further, "...(c)ertain forms of economic damages are also excluded from the Guidelines' definition of 'actual loss.' These include 'costs incurred by victims primarily to aid the government in the prosecution and criminal investigation of an offense." United States v. Smith, 751 F.3d 107, 118 (3d Cir. 2014) (Quoting U.S.S.G. § 2B1.1 cmt. n.3(D).

"Intended Losses" are generally the measure used as opposed to the "Actual Loss", as "Actual Loss" "...normally includes credit for repayments received prior to discovery of the crime, it is intended loss rather than actual loss that typically is the focus of a sentencing court's inquiry when a court considers whether to grant credit for repayments." United States v. Hartstein, 500 F.3d, at 797-98. See also, United States v. Callaway, 762 F.3d 754, 759 (8th Cir. 2014).

In United States v. Gonzales the district court wrote that each of the following factors favored the downward sentencing variance pursuant to § 3553(a) it issued in the case, as the lengthy Guidelines sentence is primarily driven by a loss amount enhancement: (i) the actual loss here is considerably below the intended loss; (ii) Mr. Gonzales's personal characteristics, especially his family's reliance on him; (iii)  his mental and emotional health struggles; (iv) his cooperation with the government; and, particularly, (v) whether the Guidelines sentence would impose a higher sentence than

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **39** of 57

those who have done more harm in other fraud cases. <u>United States v. Gonzales</u>, 163 F. Supp. 3d 1078, 1129 (D.N.M. 2016). As it has become more and more common for judges to elect to vary from sentences resulting from the Guidelines enhancement for loss amount this presents a risk that unwarranted sentencing disparities can arise from courts following the Guidelines sentence when a loss enhancement is responsible for a large portion of the final Sentencing Level.

In <u>United States v. Lange</u>, 834 F.3d 58, 68 (2d Cir. 2016) the defendant, Kristofor Lange, engaged in securities fraud for which he was sentenced to five years' probation and ordered to pay $780,000 in restitution to the victims of his fraud. <u>United States v. Lange</u>, 834 F.3d 58, 68 (2d Cir. 2016).

U.S.S.G. § 3553(a)(6) requires the Court to consider what sentence these facts would result in for another defendant, especially given the skepticism courts around the country and in this circuit have viewed mechanically applying the sentence level enhancement based on loss amount, in order to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct.

When considering the appropriate sentence for Mr. Burrell the court must consider the conduct he has admitted to as the factual basis for this plea. However, the court, as part of its consideration of the U.S.S.G. § 3553(a) factors must consider whether a lengthy sentence that is primarily driven primarily by the loss amount is appropriate under the circumstances or whether to provide a variance from the sentencing guidelines, as caselaw from this circuit and others has consistently shown other courts doing.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **40** of **57**

### iii.     Demonstrated Community Support for Joshua

A huge number of members of the community have come forward to voice their support for Joshua, even knowing what he had done. In addition to the letters of support mentioned above he received an outpouring of support.

A large number of other family members wrote letter of support on Josh's behalf, including:

- Janet Burrell, Joshua's Mother. <u>See</u> Exhibit 2 (Letter from Janet Burrell).
- Fred Burrell, Jr., Joshua's Father. <u>See</u> Exhibit 3 (Letter from Fred Burrell, Jr.).
- Kelly Bagwe, Joshua's Sister. <u>See</u> Exhibit 4 (Letter from Kelly Bagwe).
- Jenny Scarpelli, Joshua's Sister. <u>See</u> Exhibit 5 (Letter from Jenny Scarpelli).
- Claire Schwaegler, Joshua's Girlfriend. <u>See</u> Exhibit 6 (Letter from Claire Schwaegler).
- Angela Shackleford, Joshua's Cousin. <u>See</u> Exhibit 7 (Letter from Angela Shackleford).
- Judi Street, Joshua's aunt. <u>See</u> Exhibit 8 (Letter from Judi Street).
- Mahesh Bagwe, Joshua's Brother-in-law. <u>See</u> Exhibit 9 (Letter From Mahesh Bagwe).
- Micah Scarpelli, Josua's Brother-in-Law. <u>See</u> Exhibit 10 (Letter from Micah Scarpelli).
- Clare Olivia Glenn - Joshua's ex-fiance. <u>See</u> Exhibit 11 (Letter from Clare Olivia Glenn).
- Pete Scarpelli - Joshua's sister's brother-in-law. <u>See</u> Exhibit 12 (Letter from Pete Scarpelli).
- Michael Scarpelli - Joshua's sister's father-in-law. <u>See</u> Exhibit 13 (Letter from Michael Scarpelli).

Joshua's family has offered an immense level of support, including each of his sisters opening their homes to him since his arrest. Mr. Bagwe has committed that ", I'm happy to financially support Josh whenever he is able to rejoin society. Whether staying with my family, getting him an apartment, introducing him to future job contacts, or whatever it takes to get him on his feet again, I am happy to facilitate or provide." <u>See</u> Exhibit 7. His ex-fiance described him as "...not a flashy person, he never spends a

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **41** of **57**

dime on himself, hardly ever drinks, is not interested in showing off or having any

luxuries in life…" See Exhibit 9.

Joshua's mother, Janet Burrell, described Mr. Burrell's life with:

Myself being a single mother of three children, I always had to work
constantly. While working Josh spent a lot of time with his grandparents
and gained a strong loving relationship with them. I watched him grow and
Josh always seemed to keep his nose to the grind and stay out of trouble.
During high school he always had a good GPA, while working two jobs
and he also volunteered to help blind children ski at the local ski resort. He
was also a big brother to one of my good friend's son, who was a young
black boy growing up without a father figure. This young boy Josh
mentored turned out to be successful young man. After high school Josh
was the first in the family to go to college and earned his college degree at
St Louis University, a well respected Jesuit catholic school. He stayed in
St Louis after graduation and continued to succeed at his job at AAA, in
accounting/ finance field. He knew his passion was in finance and went to
New York City to pursue his dreams.
He saved his money and moved to NYC and supported himself to the
point where he paid all of his student loans off in a reasonable time all by
himself. My son wore shoes that had holes in the bottom of the soles, to
keep his costs down, and I think it also was a reminder to him where he
has come from.
Josh has been a fantastic uncle to his seven nieces and nephews, ranging
in age from 3-17 years old, everybody loves Uncle Josh. He has been
there for his friends, family and work colleagues. He shows a humbleness
and kindness to everyone he meets.

See Exhibit 2.

Joshua's Father, Fred Burrell, Jr. expressed:

One of my biggest regrets was not being in my son's life when he was
growing up. Josh has overcome many obstacles somehow with strong
positive attitude. If there was ever a problem he will dig to find a solution.
He was the only one to even think about college and he finished his
studies with honors. I asked Josh to help me with a construction project
one time when he a teenager and I could tell he was good in math and
things I wasn't. I told him about we do things in construction using the 3, 4,
5 method… measuring 3 inches then 4 inches and the difference is 5
inches to get a perfect angle. Josh knew this but called it the Pythagorean
theorem, and that was the moment when I knew my son doesn't belong on
a construction site.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **42** of **57**

What's more Josh has a strong work ethic and willing to put in the work to get things done. He doesn't blame others and admits his mistakes. Josh regrets his mistakes now more than ever before, and has said he still wants to make me others proud in the future.

He has my support which is clear. And Josh has supporters here that are not family that he may have never of known too. A successful and well respected business owner (Joe Weisman) knew Josh was a good worker and going places after just one conversation. Joe still asks about Josh whenever I see him. I just helped John Weisman with some carpentry work last week and can reconnect Josh to John (or John's brother Joe) that I am positive would hire Josh in some way.

See Exhibit 3.

Joshua's sister, Kelly Bagwe, wrote that, in her experience:

Josh has always been a loving and caring person. He is the youngest of three kids and was the only one that graduated from college. He had to take out student loans, worked a full time job while going to college and became the first in the family (including mom and dad) to have a college degree from St Louis University. He showed grit and perseverance to overcome the challenges it took to graduate….

I understand that Josh is in a situation that could involve Jail time and if put on probation in St Louis…I'm willing to support him with a roof over his head, I will financially support him, help him find work and will continue to help him move forward with his life. I know Josh will stay on a good course, in St Louis and continue to do good for himself and the community around him.

See Exhibit 4. Joshua has been open and honest with his family about the mistakes he has made and they stand ready to support him throughout this process, knowing that Joshua will remain someone dedicated to trying to improve the lives of others as his primary motivation in the projects he commits to.

Jenny Scarpelli, Joshua's other sister, described Mr. Burrell's upbringing and the impact it had on him as:

…I do feel the need to tell you about the uniquely selfless person Josh Burrell is, and the honorable and caring nature that defines him.

Though Josh lives here now, and I now live in the suburbs, our family is not originally from Manhattan. We grew up in a part of St. Louis, Missouri that in 2022, we would call, "low income." In the 1980s, it was just

> plain poor. When we were very young, our parents stopped being reliable parts of our lives. I could say it in a more dramatic way, but what it really meant was that I became "mom" to Josh and our younger sister. While my age forced me to play that role, we all helped out and raised each other. There was no one to buy groceries, or make dinner, or pay rent, or buy clothes, or check homework, or just care for us like parents should. We were on our own, practically, emotionally, and financially.
>
> That meant that Josh was always different than the other kids because he had to be, and he was bullied because he was living like a 25 year old when he was only 14. When he wasn't at school, he worked nonstop to earn money for our household and he saved every dollar to make sure we had what we needed. To this day, there is no one I have ever met that is more responsible with money and more reliable in conserving it to make sure we're all safe for a rainy day. That's because our entire childhood was one long rainy day, so that became Josh's default way of protecting those he loved. Since he was a teenager, he knew that hard work and being diligent with saving money was the only way to save his family from external forces that could hurt them.
>
> No kid should grow up like that. Period. But Josh did, and instead of becoming cold or afraid to be vulnerable, he became relentless about helping others. Not having parents or even mentors to look up to made Josh work to prevent others from experiencing that. Before he was an adult himself, Josh was a volunteer at the Big Brother Program in the inner city that he was still fighting to survive. He made it his mission to be everything our own parents weren't: reliable, caring, and supportive. And he will never stop trying to help others, no matter what life throws at him.

See Exhibit 5. Ms. Scarpelli goes on to describe how Joshua, even when working 60+ hour weeks, would bring his smile and infectious energy to their visits every weekend. Id. Ms. Scarpelli further discusses Joshua's selflessness and the care he shows other, especially children, and thanks Joshua for acts as a role model for younger people as he is the "...intellectual and emotional figurehead in their lives that will support them forever." Id.

Jenny's husband, Micah Scarpelli, who has known Joshua for more than fifteen ("15") years, wrote:

> In my career, I have been fortunate enough to build a successful video and audio production business based here in New York, and that has required a huge investment of time on my part. As my company has

grown to more than 60 employees across the country, Josh has been an incredible uncle to our three children, and his commitment and reliability makes him closer to an invaluable third parent. He and his sister Jenny have always been very close, but the fact that their own parents were effectively absent for much of their childhood has created an unstoppable drive - especially in Josh - to provide overwhelming love and care to our kids. Without sharing more than necessary, their family had no stability from adults, and Josh and his sisters were forced to raise themselves. So, in reaction to the dedication Josh never had, he has dedicated himself to being a positive and unfailingly supportive presence in their lives.

   Even during the period of his career when he was both working full time and studying at nights (and rarely sleeping), Josh still made time for all of us. That's who Josh is, and how he's wired. He never wavers when it comes to giving of himself, to being empathetic, and to being a stable presence, no matter what is happening in the world. During the pandemic he became even more important, as he brought a safe and sane face into our home, when things were hard for everyone. When the mask mandate was lifted, my daughter was still scared to be questioned by peers about not wearing a mask, and it was only Josh who could give her the confidence to trust her gut and not let the fear of others shake her resolve. He just sat with her and reasoned through her emotions until she felt secure in herself - something which brought me to tears at the time.

   I realize in writing this that I could go on and on, providing dozens of similar examples of Josh's character, his stable love and commitment, and not even scratch the surface. The irony is that this letter pledging support of Josh is truly revealing just how much he supports us. To top it off, he is brilliant in his strategically cautious counsel, and I have never trusted his business advice more as my company continues to grow.

See Exhibit 10.

Joshua's girlfriend, Claire Schwaegler, wrote a letter of support describing their relationship since they began dating in 2020 and her experience as Mr. Burrell's friend of several years developing into a romantic relationship. When Ms. Schwaegler lost her job during 2020 not long after the two began dating Joshua was "...incredibly busy with his own work…" but was still able to be "...incredibly supportive and [to] dedicate[] significant time and energy towards helping me navigate what my next steps would be."

See Exhibit 6. Ms. Schwaegler accompanied Joshua on a trip to Coatesville, one of the only trips they've been able to take as a couple, and she witnessed the dedication and

passion that had him waking early and working late, even through the weekend, and that Joshua dedicated significant time to teaching financial literacy to residents so they could better navigate their financial lives. His focus was not solely on seeking financial gains, but the goal of improving underserved communities was paramount to Joshua in Claire's experience. See Exhibit 6.

Ms. Schwaegler writes that aspects of Joshua have remained consistent while shes known him, particularly how he "...has prioritized the well being of others over his own." See Exhibit 6. However, she has also "...more directly witnessed the changes in his personality and interactions with me. He is much more communicative and accountable. Josh has taken time to understand the aspects of a relationship that are most import to me, and prioritizing those; even when not immediately convenient." See Exhibit 4. She highlights the contrast of this to Joshua when the two began dating. Claire goes on to describe the impact Joshua's presence in her daily life has, and continues to have as an integral part of her life and how she has seen that Joshua "...recognizes his wrongdoings and is incredibly remorseful." See Exhibit 6.

Michael Scarpelli relates that, while they both worked in sustainable investing Mr. Burrell takes such a different approach that always awed him because: "Josh looked for ways to have both a sustainability and societal impact, such as collaboration with groups like Second Chance Farms. I think this passion for a dual benefit comes from a desire to give others the helping hand up that wasn't readily available to him from where he started." See Exhibit 13. Michael Scarpelli has seen that Josh "…has been an excellent uncle to all his nieces and nephews and would get directly involved with them playing soccer, reading and many other activities at different age levels. He is not a guy

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **46** of 57

who just sits there and simply watches television with them. He has always remained

involved with his entire family." <u>See</u> Exhibit 13.

A number of friends, business colleagues, and even investors in Activated (who

were the victims of Mr. Burrell's criminal actions) have also written an outpouring of

letters in support of Joshua  to this Court:

- Xayphet Phongvichith, Business Acquaintance. <u>See</u> Exhibit 14 (Letter from Xayphet Phongvichith).
- Scott (Zijun) Qu, Former Employee. <u>See</u> Exhibit 15 (Letter from Scott (Zijun) Qu).
- Leo Coffield, Friend. <u>See</u> Exhibit 16 (Letter from Leo Coffield).
- Deborah Mileur, Former Boss. <u>See</u> Exhibit 17 (Letter from Deborah Mileur).
- Evan Bartle, Chief Growing Officer Second Chance Farms. <u>See</u> Exhibit 18 (Letter from Evan Bartle).
- Nick Bayne, friend. <u>See</u> Exhibit 19 (Letter from Nick Bayne).
- Gary W. Smith, Non-Profit Leader. <u>See</u> Exhibit  20 (Letter from Gary W. Smith).
- Adam Wibbenmeyer, Friend. <u>See</u> Exhibit 21 (Letter from Adam Wibbenmeyer).
- Scott Niswonger, Chairman of the Niswonger Foundation. <u>See</u> Exhibit 22 (Letter from Scott Niswonger).
- Jason Caldwell, friend. <u>See</u> Exhibit 23 (Letter from Jason Caldwell).
- Rebecca Mun, Friend and Activated Investor. <u>See</u> Exhibit 24 (Letter from Rebecca Mun).
- Renee Volz, Family Friend. <u>See</u> Exhibit 25 (Letter from Renee Volz).
- Richard E. Bennet, II, CEO of Epicured. <u>See</u> Exhibit 26 (Letter from Richard E. Bennett, II).
- Jerid C. Fortney, Friend. <u>See</u> Exhibit 27(Letter from Jerid C. Fortney).
- Sue O'Farrell, family friend. <u>See</u> Exhibit 28 (Letter from Sue O'Farrell).
- Carl Ploesser, family friend.. <u>See</u> Exhibit 29 (Letter from Carl Ploesser).
- Andrew Casperson, fellow volunteer. <u>See</u> Exhibit 30 (Letter from Andrew Casperson).
- Peter McCarthy, Friend and Investor. <u>See</u> Exhibit 31 (Letter from Peter McCarthy).

The  consistent theme across Mr. Burrell's Letters of Support is his selflessness

and care for others. Ms. Mileur said of Josh that "He has always been willing to put in

the long hours it takes to complete his studies, finish a project and truly work toward

success for his team and others.Joshua is a humble and gentle man, always putting others first." See Exhibit 17. Leo Colffield said "Even though we lived in different countries, Joshua would frequently maintain contact with me via phone call conversations. This certainly helped me cope through what was a very challenging time for myself. He was always upbeat and supportive and provided me with the hope that there was indeed some light at the end of my very dark tunnel." See Exhibit 16.

Rebecca Mun, Mr. Burrell's former colleague at Colonial Consulting, personal friend, and, together with her husband, investors in Activated. In spite of her and her husband being among the victims of Mr. Burrell's securities fraud, Ms. Mun said:

> As a co-worker, Josh was always one of the first people to offer help, answer questions, and provide a listening ear. It was also at Colonial where Josh pushed the investment committee to consider ESG (environmental, social, and governance) when looking at new investment managers for our clients, which he continues to push for today. After leaving Colonial, Josh and I stayed close friends. Josh was a sounding board for me as I considered different career routes and encourage me to complete my MBA. I can honestly say that Josh's support had a profound impact on my life and career.
> When Josh told me about starting Activated and the fund's overarching mission, I couldn't picture a better person to be at the helm of the fund. Josh is not your typical Wall Street fund manager – he is modest, puts the fund's LPs first and cares deeply for the communities in which the fund invests. Josh's character and professionalism were the reasons why my husband and I decided to invest in Activated. We would not have invested if Josh were not in charge. When we initiated a discussion with Josh about the opportunity, he was very helpful and thorough in guiding us through the fund's mission, investment terms and parameters, as well as logistics for submitting our investment. During the term of our investment, Josh was always responsive and transparent about what was going on with the fund.
> My husband and I are aware of the case and the allegations being brought against Josh. Given Josh's character and prior dealings with him, I do not believe that any of his actions were taken with ill intent or malice. My trust in Josh, given the loyalty, trustworthiness and selflessness he has demonstrated over the years, is unwavering and I believe that he is well-deserving of any clemency or leniency that the court is able to offer.

<u>See</u> Exhibit 24. That even one of the victims of his fraud have written a letter of support to express her belief that Mr. Burrell should be afforded leniency and clemency with regards to his crime.

>    Nick Bayne wrote:
>
>    In my early and developing recovery, I had the support of my family and a single friend, who was always there to meet for coffee, a sober dinner, a walk, or anything else. That friend was Josh. Josh never tried to advise me or attempt to second guess the struggles of addiction; Josh simply stood by me, month after month, providing stability that made it possible for me to stay sober then and why I can proudly say I have been sober for 10 years.

<u>See</u> Exhibit 19.

>    Gary Smith revealed that:
>
>    Most important, the residents of mixed ethnic groups also welcomed Josh and his humble respectful approach and interaction with the community. An example would be when the COVID pandemic forced the schools to close and virtual at-home learning transformed home environments. Josh purchased and gave away dozens of desks and other items to the less fortunate families in the City for their children's students.

<u>See</u> Exhibit 20.

>    Adam Wibbenmeyer, a friend of Mr. Burrell's for more than 30 years, related how:
>
>    The day after we graduated high school, three of our classmates were in a car accident and two were killed, I was at Josh's house when our friend came in and told us the news. Josh and I were shocked to hear of their death, I remember starting to cry. Without hesitation Josh reminded me that we are still very fortunate to still have friendship and a whole life ahead of us, and to be thankful that we weren't in the car with them.

Mr. Wibbenmeyer goes on to describe how Josh was there for him when: I contemplated ending my life. And by some miracle, without voicing out these thoughts,

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **49** of **57**

Josh had  reached out." He credits Josh with reminding him what to live for and taking him out of that mindset. See Exhibit 21.

Mr. Niswonger describes how Josh passionately dedicated his time to assisting the foundations goals of sustainably impacting workforce development and education in Appalachia together with the dedication, skills, and experience to turn an abandoned church into a theater and performing arts space for the non-profit. See Exhibit 22.

Jerid C. Fortney explained:

Josh is just very, very driven. He doesn't just want to be successful; he needs it. He came from meager beginnings, and he has single-handedly lifted himself up to what most people would consider a "big success". He has been laser-focused for many years on starting his business and making it thrive. But his goal was never to make it thrive just for him, but to make sure that he was helping others. The "winwin" concept of his company wasn't just a gimmick to him. It wasn't just a talking point or a way to sell the product. It was a requirement. Josh genuinely believed that his business venture would be making the world a better place for those that were struggling.

I don't know all the details of his purported crimes and I told him I don't need to. I know Josh Burrell to be an honest man and an extremely loyal man. I used to beg him to come over to Brooklyn on Saturday nights to go bar hopping with me and he would always tell me that "it's too far" or "I can't get a cab" or something. But then somehow magically on Sunday - and I mean every Sunday - he would make it over to Brooklyn to spend the day with his sister and her family. I guess Brooklyn's not "too far" when family is involved.

See Exhibit 27.

Richard E. Bennett, II, the CEO of Epicured Foods, who has known Joshua for more than three ("3") years professionally and now considers Joshua a friend:

In the past 6-8 months, Josh initially volunteered his time as an Analyst at Epicured to find productive use for his time and to further support me and the Company as we face the challenges of growing a young organization out of a pandemic and into a recession. Josh's volunteer contributions affirmed for me his desire to be a constructive and productive member of society, to align with impact-oriented organizations, and to be humble

enough to do tasks from unloading trucks to producing invoices to drafting presentations on my behalf. Moreover, his candor and openness about his circumstances displayed humility, honesty, and a desire for others to feel comfortable and informed within the organization. As such, I insisted that Josh accept a paying position for his work, his diligence and for the tremendous value he was adding to the Company.

I am not aware of the intricacies and details of the charges and findings of Court. I have focused instead on the human being I have come to know and respect, Josh Burrell, and the positive impact he has had on me and my company- Epicured. So it's through this lens, and with respect to the Court, that I express my support and confidence in Josh's ability to lead a life that will benefit society, to learn from mistakes, and to continue adding value to organizations like Epicured. In short, I support Josh's second chance and stand in support of him on the next phase of his journey in life.

<u>See</u> Exhibit 26.

Sue O'Farrell wrote:

I have known Joshua Burrell his whole life. I have been friends with his Mom, Janet Burrell for 50 years. Hes been a fighter since the day he was born. From giving himself injections for his small statute to putting himself through college and working several jobs, hes has always been a very dedicated, hard working person; a very polite and respectable young man. This is why it's hard for me to fathom Josh doing anything he shouldn't. The Josh I know is a very caring, loyal, host, fun person and the best uncle to 7 awesome nieces and nephews. He is always helping out with them and anyone in need of help whenever possible. I am hoping a new life back in St. Louis surrounded by family and friends to get him back on the right path. He will definitely be an asset to society and a huge asset to his family that love him

<u>See</u> Exhibit 28.

Ms. O'Farrell's husband, Carl Ploesser also wrote a letter of support, saying:

My name is Carl Ploesser. I first met Joshua Burrell in February, 1996. I was (and still am) dating Sue O'Farrell. Sue and Janet Burrell (Joshua's Mom) are long time friends. The first time I met Joshua, I loved what I saw in this young man; a smile that would light up a room (still does). Joshua is so polite.. He always answered my questions with a yes sir, no sir answers. Joshua has a heart of gold. My youngest son (Zachary) overdosed and passed away on December 21, 2018. The next morning I got a call from Joshua wanting to talk with me; console me and making sure I was ok. In 2009 Joshua told me he was moving to New York to pursue his dream in finance. At first I was sad because Joshua was

moving so far away but also happy because I knew Joshua would be successful. I'm so proud of the man Joshua has become. I love Joshua like 'a son', and will stand behind Joshua as long as I'm on this Earth.

<u>See</u> Exhibit 29.

Peter McCarthy was introduced to Joshua while Mr. Burrell was soliciting

investors for Activated. Mr. McCarthy described:

I was introduced to Mr. Burrell early 2019 in New York by a trusted colleague and friend. I was interested in expanding my family's real estate investments. Mr. Burrell proceeded to show me his vision of real estate investment. He went above and beyond showing me what I was interested in. In the end the investment was not a good fit for my family, but Josh became a valued friend. Joshua Burrell is a good person.

Josh Burrell never misrepresented anything to me regarding his investment strategy. His strategy was sound and if anything a bit modest for my tastes. We bonded over how we want to make this country a better place, charity, mentorship, health. Josh is a truly good person. He is the one friend I trusted to look over my young rescue dog Augustus.

I have read as much as I could about Mr. Burrell's indictment. I was shocked of course, but almost immediately I realized if Mr. Burrell wanted to take advantage of me, he could have done so. This was never his intent. He was transparent for months as we worked closely. This crime should have a fair and corresponding punishment in my judgement. We have all made mistakes, and nothing has been easy in the COVID-19 era, but Mr. Burrell is a good man who undoubtedly will serve society in positive and dynamic ways should you mercifully extend his life as a free man.

This is a letter I could not take lightly. Reputation is everything. I prayed over it, I read up all I could on the case, I spoke to mutual colleagues and friends. In the end, on the order of Benjamin Franklin's written advocacy in support of one Thomas Paine travelling to America in 1774 I write in support for Joshua Burrell's freedom. Great things will come from the next act of Josh's life regardless of what path he may take. He is a kind, patient, professional person with a big heart.

<u>See</u> Exhibit 31.

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **52** of **57**

    Andrew Caspersen is in a unique position among those who wrote letters of support, as he had previously pleaded guilty to securities and wire fraud and completed his supervised release. Mr. Caspersen has witnessed how Josh "...regularly acknowledges his crime and actively seeks a path of atonement and redemption…" as revealed by their "... regular conversations since his rock bottom as well as his acts of service." <u>See</u> Exhibit 30. Mr. Caspersen has been surprised that Joshua, unlike so many others Mr. Caspersen interacted with while in prison, has been steadfast in his "...regular insistence that he alone is to blame for his crimes and he is ready and willing to make amends…", he's even "...pressed [Josh] on this on multiple occasions and yet he has remained steadfast in his acceptance and his complete surrender to the consequences." <u>Id</u>. Mr. Caspersen also describes how, while volunteering at a soup kitchen with Joshua that Joshua "... is always eager to assist in all tasks, from sweeping to food prep to serving. In doing so, he has embraced humility and service, indispensable tools in recovery from criminal behavior in my experience." <u>Id</u>.

    Mr. Burrell's service efforts have been recognized by the media, including:

- <u>Coatesville Opportunity Zone Impact Fund donates learning supplies to city students | chescotimes.com</u>,
- <u>http://cfany.gallery.video/cfasanfran/detail/videos/speaker-interviews/video/6117159658001/real-estate-for-charitable-and-investment-returns-with-josh-burrell-activated-capital?autoStart=true</u>
- <u>Josh Burrell Interview starting at 1:30</u>
- <u>https://www.dailylocal.com/2020/12/23/year-in-review-brighter-days-ahead-for-city-of-coatesville/</u>
- <u>https://vista.today/2021/06/pair-churches-in-coatesville-event-spaces/</u>
- <u>https://lancasteronline.com/news/regional/investors-plan-theater-eye-coatesville-city-for-growth-despite-pandemic/article_f160427c-84f6-11ea-9ab6-0b1edd9ac0d5.html</u>
- <u>https://www.westernchestercounty.com/news/coatesville-poised-to-be-home-to-chester-countys-hottest-new-venues/</u>
- <u>EIG Report - Page 10 Josh Burrell Seeding neighborhood revitalization</u>

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **53** of **57**

- https://vista.today/2020/04/coatesville-impact-fund-established-to-focus-on-commercial-residential-development/
- https://www.dailylocal.com/2020/09/18/advocates-see-brighter-days-for-the-city-of-coatesville/
- https://opportunitydb.com/2019/03/activated-capital-017/
- https://shows.acast.com/deposit-that/episodes/bonus-episode-the-wizard-of-opportunity-zones-with-josh-burr
- https://www.coatesville.org/wp-content/uploads/2021/04/03-22-2021.pdf

Mr. Burrell has consistently sought to make a positive difference in the lives of others. He has been recognized for this throughout the media reports listed above. The Letters of Support from his family and friends attest to someone who volunteers his time, donates to help those in need, and is there for others even in their darkest hours. Mr. Burrell made mistakes, but he has demonstrated for his entire adult life that, if he is given the opportunity, Josh will do everything he can to try to improve the lives of some of the worst off among us.

### iv.  Mr. Burrell's Efforts to Make Restitution to his Victims

As part of his plea agreement Mr. Burrell agreed to make restitution in the amount of $5,763,420 pursuant to 18 U.S.C. §3663A(a)(3). Joshua further agreed that this obligation to make this restitution is, and will be, a condition of his supervised release pursuant to 18 USC § 3563(b)(3). This number accurately reflects investments made into Activated as a result of Mr. Burrell's criminal actions that lead to him pleading guilty to count 1; however, we respectfully submit that, due to how Activated and the investments were structured (together with the strong cashflow from, and appreciation on, the underlying real estate assets) this amount overstates Mr. Burrell's culpability for the purposes of 18 U.S.C. § 3553(a) when compared to others sentenced based on the same dollar value of fraud. This is due to the fact that most fraud cases under USSG §2B1.1(b)(1)(J) do not result in the victims owning any underlying assets or where the

proceeds are kept by and/or used for the benefit of the perpetrator rather than invested into real estate overwhelming owned by the limited partners of the fund (and which Mr. Burrell has since given up all of his partnership interest in, so at no point in the future will any of those funds accumulate to Joshua).

Mr. Burrell has already made substantial efforts towards making restitution to his victims. Mr. Burrell owned 51% of the shares in Activated; as part of his departure from Activated Mr. Burrell surrendered these shares to the general partner. Based on Andy Willis's investment of $500,000 for a 15% share of Activated the valuation for it as a whole, as of December 25, 2019, was $3,333,333.33 (Andy further invested an additional $3,000,000 in his capacity as a limited partner at the same time). This implies that Mr. Burrell's shares were worth $1,700,000 at the time. This valuation was based on the cashflow from Activated's properties as well as the value of the underlying real estate. Real estate across the country has appreciated approximately a 25% annual rate since 2020, this implies that, at the time he surrendered his shares, the value of Mr. Burrell ownership stake in Activated was at least $2,125,000.

Mr. Burrell surrendered the shares to Activated's remaining general partners in order to totally separate himself from management of the fund as quickly as possible after his actions leading to the instant charges came to light. It was, and remains, Mr. Burrell's hope that these shares, rather than being held by the general partners, will be given to the limited partners.

The general partners and limited partners in Activated have seen the value of their partnership interests increase in the time since Mr. Burrell's departure, in addition to the cash flow from rents and tax benefits the limited partners have been able to

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **55** of 57

realize throughout the course of Activated's operation. As a result of how Activated had been structured, while Activated is listed as the owner of more than 100 units the limited partners were able to realize all the benefits of direct ownership, including tax benefits available to owners, while having their liability limited to the value of their investment (together with the appreciation in the value of those shares since the time of the investment) rather than those benefits accruing for Activated's benefit. The limited partners' investments were used to fund the purchases of Activated's properties and, at this time, the value of the funds underlying assets is such that if all limited partners were to redeem their shares they would see a collective gain of roughly __% on their initial investments.

### v.    The Court Must Consider the Kinds of Sentences Available, Including Non-Incarcerative Alternatives

In deciding whether or not to make use of a non-incarcerative alternative sentence this court can consider not only the impact on the defendant and the general deterrence effect, but also that negative impacts from an incarceratory sentence on the defendant's family and the community at large. Gall, 552 U.S., at 58-59.

"Section 3553(a)(3) requires the Court to consider the kinds of sentences available, including non-incarcerative alternatives." United States v. Diambrosio, No. 04-66, 2008 U.S. Dist. LEXIS 20963, at *16-17 (E.D. Pa. Mar. 13, 2008) (Citing Gall, 552 U.S., at 59). See also United States v. Diaz, No. 11-CR-00821-2 (JG), 2013 U.S. Dist. LEXIS 11386, at *65 n.106 (E.D.N.Y. Jan. 28, 2013).

### III.    CONCLUSION

Mr. Burrell is someone who society would benefit from not sending to prison; an incarceratory sentence is greater than necessary under the circumstances. Rather,

avoiding the costs of incarceration to the people, the impact the loss of Mr. Burrell's income on his ability to make restitution to his victims, and allowing Mr. Burrell to work and continue contributing towards projects helping felons with reintegration and improving access to broadband in rural communities, while a sentence of time served and a period of supervised release ensures that Mr. Burrell's behavior will be monitored to ensure he does not return to committing criminal acts. Writer Greg Boyle once said, "Redemption is the measure of a civilized society." This is true, as in a civilized society, we understand that though you may err, fail, and fall; redemption is always possible if you are committed to it.

Joshua is a devoted son and grandson who has always had a close connection with his family. He is working two jobs in addition to his unpaid consulting on the felon reintegration and rural broadband projects. It is because of all this we implore this Court to sentence Mr. Burrell to a period of time served and a period of supervised release not to exceed three years. Joshua has continued to demonstrate a drive and commitment that will serve him as he works to pay complete restitution to his victims and continue pursuing projects aimed at improving the lives of others.

A sentence of time served and a period of supervised release is one that would not only promote respect for the law, and such a sentence is sufficient but not greater than necessary to achieve the true goals of sentencing under 18 U.S.C. §3553(a).

Hon. Lewis A. Kaplan, *Senior United States District Judge*
Page **57** of **57**

      We thank the court in advance for whatever leniency and mercy afforded.

Dated:      New York, New York
            August 30, 2022

                                    Respectfully submitted,

                                    */s/ Todd A. Spodek*
                                    _____
                                    Spodek Law Group P.C.
                                    Attorneys for Defendant
                                    85 Broad Street, 17th Floor
                                    New York, NY 10005
                                    Office: (212)-300-5196
                                    Mobile: (347) 292-8633
                                    Fax: (212)-300-6371

cc:     AUSA Alexander Rossmiller (By Email).
        AUSA Dan Loss (By Email).
        USPO Nicolo Dimaria (By Email).